IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| v. | : | NO: 1:08-CR-356-18-WSD-ECS |
| LUZ MARINA LOAIZA-CLAVIJO | : | |

**REPORT AND RECOMMENDATION**

Presently pending before the Court is the issue of whether, under the principles enunciated in <u>Daubert v. Merrill-Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and under the applicable Federal Rules of Evidence, Defendant Luz Marina Loaiza-Clavijo should be permitted to introduce polygraph evidence at trial. For the reasons discussed herein, the undersigned **RECOMMENDS** that Defendant's polygraph evidence be **DENIED** admission under <u>Daubert</u>, and under Rule 702 and 403 of the Federal Rules of Evidence.[1]

**I.
Background**

On September 2, 2008, Defendant, along with others, was indicted on charges of narcotics and money laundering conspiracy. [Doc. 1]; <u>see</u> <u>also</u> [Doc. 130]. On April 21, 2010, this Court held

---

[1] The issue of the admissibility of Defendant's polygraph evidence at trial was addressed at a pre-trial conference on July 7, 2011. [Doc. 785]. The Government made clear its opposition to admission and the Court set a briefing schedule for Defendant to file a particularized motion in support of admissibility. Defendant filed her brief, [Doc. 796]. The Government has responded, [Doc. 803], and Defendant has filed her reply. [Doc. 806].

a competency hearing under 18 U.S.C. § 4241 and found that Defendant was not competent to stand trial at that time. [Doc. 692]. Less than one month later, on May 10, 2010, Defendant submitted to a private polygraph examination. The admissibility of the results of this examination, and of the expert testimony proffered with the results, is the subject of this report and recommendation.

Pursuant to the Court's findings at the competency hearing, on May 27, 2010, Defendant was ordered to be committed to the custody of the Attorney General for hospitalization, evaluation, and treatment. [Doc. 693]. She was admitted to the Federal Medical Center-Carswell at Fort Worth, Texas. While still in the Attorney General's custody, Defendant filed, on August 19, 2010, her notice of intent to use the polygraph evidence from the May 10, 2010, polygraph examination. [Doc. 719]. On September 8, 2010, after she completed the court-ordered psychiatric evaluation and treatment, Defendant was released to return to the district. [Doc. 724]. On June 29, 2011, after a hearing, the Court found that Defendant had recovered and was competent to stand trial. [Doc. 775].

The Court held a pretrial conference on July 7, 2011, during which time the Court addressed the issue of Defendant's proffered polygraph evidence. [Doc. 785]. The parties were directed to brief their positions on whether Defendant's polygraph evidence should be admitted, thereby assisting the Court also in a determination of

whether a recommendation could then be made on admissibility or whether a further hearing was required under Daubert. In accordance with the Court's directives, Defendant filed a brief in support of admissibility on August 12, 2011. [Doc. 796]. The Government responded on August 24, 2011, in opposition to the admission of Defendant's polygraph evidence at trial. [Doc. 803]. Defendant filed her reply to the government on September 9, 2011. [Doc. 806].

On August 12, 2011, Defendant also filed a motion to hold evidence open for the aforementioned potential Daubert hearing. [Doc. 795]. Pursuant to this motion and her brief in support of admitting the evidence, Defendant requested "that the Court grant her ex parte request to retain a polygraph expert (in addition to the polygraph examiner [who tested Defendant]) to make more fully her case" in support of admitting the evidence. [Doc. 796, at 2]; see also [Doc. 795, at 1-3]. This request was granted.

The Court held a telephone conference with the parties on October 14, 2011, [Doc. 822], and Defendant was ordered to submit within thirty (30) days the affidavit of Defendant's additional polygraph expert in support of Defendant's notice of intent to tender the polygraph evidence. At that time, it was agreed that the affidavit of the expert, Dr. David C. Raskin, could be considered, along with the book, The Polygraph and Lie Detection, published by the National Research Council of the National Academies, and that

3

this material would complete the evidentiary record for the purpose of the Court issuing a report and recommendation on the admissibility of the polygraph evidence.[2] [Doc. 822]. On November 2, 2011, Defendant filed Dr. Raskin's affidavit. [Doc. 825].

## II.
## Discussion

After consideration of the evidence presented, and for the reasons set forth below, the Court finds that a further evidentiary hearing is not necessary under Daubert and that Defendant's polygraph examination evidence should not be admissible at trial under either Federal Rule of Evidence 702 or 403, as construed under Daubert.

"United States v. Piccinonna, 885 F.2d 1529 (11th Cir. 1989)(en banc), restricts the use of polygraph evidence in this Circuit to only two contexts. A district court may admit polygraph evidence when the parties stipulate in advance as to the test's circumstances and scope of its admissibility, or 'to impeach or corroborate the testimony of a witness at trial.'" United States v. Gilliard, 133 F.3d 809, 811-12 (11th Cir. 1998) (citing Piccinonna, 885 F.2d at 1536). However, this rule does not "preempt[] or limit[] in any way the trial court's discretion to exclude polygraph expert testimony

---

[2] The affidavit of the polygraph examiner, Marc E. Foster, and his report are attached to Defendant's Brief. [Doc. 796-1].

4

on other grounds under the Federal Rules of Evidence." Id. (citing Piccinonna, 885 F.2d at 1536); see also United States v. Henderson, 409 F.3d 1293, 1301-02 (11th Cir. 2005).

To admit polygraph evidence to impeach or corroborate a witness' testimony, the proponent of the evidence must satisfy three conditions. Piccinonna, 885 F.2d at 1536. First, it must provide adequate notice to the opposing party that it will offer polygraph evidence. Id. Second, the opposing party must be given a "reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions." Id. Third, the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony will govern the proffer. Id. In this case, it appears that the first two of the Piccinonna conditions were met.

**A. Rule 702 and Daubert**

Even if the admission of the polygraph evidence would otherwise be proper under the first two Piccinonna conditions to corroborate Defendant's testimony, that does not end the inquiry. The testimony must also be admissible under the Federal Rules of Evidence. Under Rule 702, as interpreted by Daubert, expert scientific evidence must be both reliable and relevant. Daubert, 509 U.S. at 589. Thus, the evidence must: (1) constitute scientific knowledge; and (2) assist the trier of fact to understand the evidence or to determine a fact at issue. Id. at 589-91. The scientific knowledge question requires

5

the trial court to consider the theory or technique upon which the testimony is based in light of at least five factors:

>    (1) whether the theory or technique can be and has been tested;
>
>    (2) whether the theory or technique has been subjected to peer review and publication;
>
>    (3) the known or potential rate of error for that theory or technique;
>
>    (4) the existence and maintenance of standards controlling the theory or technique's operation; and
>
>    (5) whether the theory or technique has attained general acceptance within the relevant scientific community.

Id. at 593-94; Gilliard, 133 F.3d at 812.

In determining whether the evidence appropriately assists the trier of fact, the Daubert Court underscored the enhanced importance and role Fed. R. Evid. 403 plays in excluding overly prejudicial evidence, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." Daubert, 509 U.S. at 595 (quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

**1. First Daubert Factor: Testing**

A polygraph examination measures an individual's physiological responses to questioning. United States v. Scheffer, 523 U.S. 303, 313 (1998) (plurality opinion). An examiner then interprets the

physiological data and gives an opinion about whether the subject was lying. Henderson, 409 F.3d at 1302. On the issue of testing, there is no question that the theory or technique of polygraph examination has been subjected to peer review and publication, see generally Raskin Aff. [Doc. 825-1], but the undersigned concludes that neither the theory nor the technique can be adequately tested – as illustrated by the fact that there is no reliable measure of a polygraph's ability to detect deception accurately.[3] Dr. Raskin states that "the basis of polygraphy ... credibility assessment is a scientific theory that can be and has been tested with the methods of science...," [Doc. 825-1, at 3], but there is no known physiological response to lying, and thus no scientific theory in that regard. Instead, polygraph "science" and research is based on hypotheses that examine correlations between polygraph testing and

---

[3] The most common technique used by polygraph examiners for the physiological detection of deception is the comparison question test, or CQT. Raskin Aff. [Doc. 825-1, at 3]. The CQT assesses credibility by looking at whether the test subject has different physiological reactions to two different types of questions. [Id.]. For example, a subject may be asked a direct accusatory question that addresses the issue under investigation, followed by one that is more ambiguous and meant to illicit a negative response. [Id.]. "The rationale of the comparison question test predicts that guilty subjects will produce larger physiological responses to the relevant questions to which they know they are deceptive, than to the relatively unimportant comparison questions." [Id. at 4]. The CQT technique was used in Defendant's May 10, 2010, polygraph examination [Doc. 825-1, at 4], that was performed by Marc. E. Foster, a licensed polygraph examiner. See generally [Doc. 719].

7

purported rates of accuracy in determining deception. See [Doc. 825-1, at 5-14].

"Practitioners do not claim that the instrument measures deception directly. Rather, it is said to measure physiological responses that are believed to be stronger during acts of deception than at other times." Committee to Review the Scientific Evidence on the Polygraph, The Polygraph and Lie Detection 13 (National Academy of Sciences, 2003).[4] The problems associated with this type of testing are numerous: physiological responses consistent with deception may also be the product of various conditions that have nothing to do with the truth or falsity of a response. As stated in The Polygraph and Lie Detection:

> Almost a century of research in scientific psychology and physiology provides little basis for the expectation that a polygraph test could have extremely high accuracy. Although psychological states often associated with deception (e.g., fear of being judged deceptive) do tend to affect the physiological responses that the polygraph measures, these same states can arise in the absence of deception. Moreover, many other psychological and physiological factors (e.g., anxiety about being tested) also affect those responses. Such phenomena make polygraph testing intrinsically susceptible to producing erroneous results. This inherent ambiguity of the physiological measures used in the polygraph suggests that further investments in improving polygraph technique and interpretation will bring only modest improvements in accuracy.

---

[4] The cited source is the aforementioned book and was submitted as Def.'s Ex. 3 to [Doc. 796].

8

> Polygraph research has not developed and tested theories of the underlying factors that produce observed responses. Factors other than truthfulness that affect the physiological responses being measured can vary substantially across settings in which polygraph tests are used. There is little knowledge about how much these factors influence the outcomes of polygraph tests in field settings.... The lack of understanding of the processes that underlie polygraph responses makes it very difficult to generalize from the results obtained in specific research settings or with particular subject populations to other settings or populations, or from laboratory research studies to real-world applications.

Id. at 2-3. Recognizing the inherent inadequacies of the studies that purport to test the validity of polygraph examination results, the Court finds that, under the first Daubert factor, neither the theory nor the technique of polygraph testing used in this case has been or can be adequately tested.

**2. Second Daubert Factor: Peer Review and Publication**

The government concedes that the general theory and technique of polygraph testing has been subjected to "numerous studies, research, peer review, and publication over nearly a century." [Doc. 803, at 8].

**3. Third Daubert Factor: Rate of Error**

The inability to test adequately the validity of polygraphy raises problems for establishing a reliable error rate. Unsurprisingly, accuracy in examination results is highly variable across situations, as previously discussed, and the quality of the studies "falls far short of what is desirable." The Polygraph and

9

Lie Detection 3. Despite Dr. Raskin's assertion that "the CQT very accurately discriminates between truth tellers and deceivers," [Doc. 825-1, at 8], there is no basis to establish a reliable error rate for polygraph results. "[S]pecific incident polygraph tests can discriminate lying from truth telling at rates well above chance, although well below perfection." The Polygraph and Lie Detection 4; see also United States v. Scheffer, 523 U.S. 303, 310 (1998) (noting that while some studies show polygraph tests to be accurate and reliable, others have found the use of the CQT technique to be as accurate as tossing a coin). Moreover, because "the only thing that a polygraph examination proves is that the examinee believes her own story," Norelus v. Denny's, Inc., 628 F.3d 1270, 1284 (11th Cir. 2010) (citations omitted), "accuracy," in the context of polygraph results is a very slippery term.

Defendant asserts that, because polygraph testing has a known error rate, "the quality of the error rate is a factor that goes to the weight to be given the evidence, not the admissibility." [Doc. 806, at 3]. But under Daubert, the error rate, or potential for error, must be considered as a factor in deciding whether Defendant's polygraph evidence constitutes scientific evidence, which speaks to its admissibility. Accordingly, the Court finds that, in conjunction with the inability of polygraph results to be adequately tested, there is insufficient evidence to establish a

10

reliable error rate or to know the true potential for error in polygraph examinations. See Henderson, 409 F.3d at 1303 (upholding exclusion of polygraph evidence where the magistrate judge found that the error rate for polygraph testing did not meet the stricter standards of scientific methods).

**4. Fourth Daubert Factor: Standards**

The Court also finds that the fourth Daubert factor, the existence and maintenance of controlling standards, weighs against admissibility in this case. Defendant, through Dr. Raskin, submits that numerous standards exist in the administration of polygraph tests. [Doc. 825-1, at 31]. These standards are maintained and enforced by various agencies and institutes and are based upon scientific principles and procedures. [Id.]. However, maintenance and adherence to such standards are self-imposed and cannot adequately guarantee the validity of the polygraph result. As noted by the Court in Scheffer, an examinee could still adopt deliberate countermeasures to defeat accurate readings. 523 U.S. at 310 n.6. Thus, even with the existence of and adherence to standards, the result may not be accurate. In this case, moreover, Defendant's polygraph examiner, Mr. Foster, did not follow all of the American Polygraph Association's Standards of Practice, the rules to which he generally adheres. [Doc. 796-1, at 2]. Specifically, Mr. Foster did not videotape or record the test, as required by APA Standard

11

3.9.9. The absence of any recording or video deprives both the jury and the government of their ability to see the test and judge whether Mr. Foster complied with applicable standards necessary to assure a fair and reliable test. For these reasons, the Court finds that the fourth Daubert factor weighs in favor of excluding the evidence.

**5. Fifth Daubert Factor: General Acceptance**

As to the fifth Daubert factor – general acceptance of the technique – Defendant submits that the fact that the FBI and other law enforcement agencies use polygraphy can only be explained by a general acceptance of the technique. [Doc. 796, at 16]. But a review of the case law in the federal circuits and the Supreme Court show substantial disagreements over the effectiveness of polygraphs. See Scheffer, 523 U.S. at 309 ("[T]here is simply no consensus that polygraph evidence is reliable."); Henderson, 409 F.3d at 1303. And there is no consensus within the scientific and legal community over the efficacy of polygraph evidence. See Polygraph and Lie Detection 213-14 ("The research on polygraph accuracy fails in important ways to reflect critical aspects of field polygraph testing, even for specific incident investigation .... Virtually all the observational field studies ... have been plagued by measurement biases that favor overestimation of accuracy, such as examiner contamination...."). As Judge Ed Carnes recently observed: "Opinions based on polygraph

12

examinations are seldom, if ever, admissible into evidence." Norelus,628 F.3d at 1284.[5] Accordingly, the Court finds that the fifth Daubert factor does not weigh in favor of admissibility.

For the foregoing reasons, the Court concludes that the polygraph examination evidence offered by Defendant does not satisfy the requirements of reliability and relevance under Daubert and would not, therefore, assist the trier of fact to understand the evidence or determine a fact at issue. Accordingly, Rule 702 is not satisfied.

## B. Rule 403

Defendant's polygraph evidence necessarily invades the province of the jury, which must ultimately determine the credibility of all the witnesses. In that regard, it has been observed that "courts do not need lie detectors, since juries already serve this function, a role that is constitutionally mandated." Polygraph and Lie Detection 206. Unlike other types of experts who assist the jury in understanding factual matters outside the juror's knowledge, a polygraph expert merely supplies the jury with another opinion, in addition to their own, as to whether the witness is telling the truth. See Scheffer, 523 U.S. at 313. While such an opinion is not

---

[5] He went on in Norelus to add "We have never held that it is an abuse of discretion to exclude the opinion of a polygraph examiner...." Id.

13

per se inadmissible, under Rule 403 the Court must weigh whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the potential to mislead the jury. See Gilliard, 133 F.3d at 815-16 (citing Rule 403).

In this case the probative value of the evidence is undermined by the factors discussed above under Rule 702 and Daubert which go to the reliability and relevance of the opinions offered. On the prejudice side is the danger that the jury may accord undue weight to an expert opinion seeking to validate Defendant's testimony on two critical and ultimate issues in the case. In particular, the two questions are whether Defendant during a pertinent time frame "conduct[ed] any financial transaction she knew at the time was illegal" and whether during the same time frame Defendant knew she "was involved with an illegal drug trafficking conspiracy." [Doc. 796-1, at p. 14]. These two questions go to the core of what Defendant knew about the illegality of the conduct she is charged with.

In addition, the amount of time needed to present the evidence would shift the focus of the jury away from determining guilt or innocence to collateral matters. See Gilliard, 133 F.3d at 815; Schaefer, 523 U.S. at 314. Add to the foregoing concerns the fact that the examination was conducted through an interpreter at a time

14

when the Defendant had been adjudicated incompetent to assist counsel and to understand the proceedings; that the government was not given prior notice or an opportunity to be present at the administration of the polygraph; and that the examination was not recorded, and the balance tips in favor of exclusion. Accordingly, the Court finds that the probative value of Defendant's evidence, which is slight, is substantially outweighed by the unfair prejudice to the Government, by the amount of time necessary to present evidence, and by its potential to mislead or confuse the jury. See Gilliard, 133 F.3d at 815-816 (affirming exclusion of polygraph under Rule 403 even where examination videotaped, but without prior notice).

## III.
### Conclusion

For all the foregoing reasons, the undersigned concludes that Defendant's polygraph evidence does not satisfy the requirements of Daubert and Rule 702; that the evidence will not assist the jury in understanding the evidence or determining a fact in issue; that the evidence has slight probative value; that the Government will be unfairly prejudiced by admission of the evidence; that the jury's focus may be diverted from the real issues in the case; that the evidence will unnecessarily prolong trial; that there is a strong potential for confusion of the issues; and that Defendant's

15

polygraph evidence should not be admitted under either Federal Rule of Civil Procedure 702 or 403. Accordingly, **IT IS RECOMMENDED** that Defendant's polygraph evidence be excluded.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore **ORDERED** that this **CASE** be and is hereby **CERTIFIED** as ready for trial.

**SO ORDERED**, this 25th day of January, 2012.

*S/ E. Clayton Scofield III*
E. Clayton Scofield III
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)